IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Criminal Case No. 22-cr-00012-WJM-1

UNITED STATES OF AMERICA,

 Plaintiff,

v.

1. **LAWRENCE RUDOLPH** and
2. LORI MILLIRON,

 Defendants.

---

**GOVERNMENT'S RESPONSE TO LAWRENCE RUDOLPH'S RENEWED OBJECTION RELATED TO CASSANDRA OLMSTEAD [ECF NO. 231]**

---

  Rudolph has renewed his objection to hearsay statements made by Bianca Rudolph to Cassandra Olmstead. ECF 231. He specifically challenges the statements offered by the government under Rule 804(b)(6)'s hearsay exception for statements offered against a party who "wrongfully caused . . . the declarant's unavailability as a witness, and did so intending that result." Fed. R. Evid. 804(b)(6). His renewed objection does not challenge Bianca's statements to Olmstead that the government previously identified as not hearsay. Nor does it challenge hearsay falling in Rule 803(3)'s exception for statements of then-existing mental condition—specifically statements of future intent under *Mutual Life Ins. Co. v. Hillmon*, 145 U.S. 285 (1892).

  The court should deny his renewed objection. The preponderance of the evidence (including Ms. Olmstead's proffered testimony and the timing of events in the SCI litigation) show that Rudolph killed Bianca with the intent (among others) of making her unavailable to testify in his ongoing dispute with SCI, as well as any future divorce proceedings.

# ARGUMENT

The court must answer two factual questions to decide whether Bianca's challenged statements to Olmstead are admissible under Rule 804(b)(6):

1. Did Rudolph cause Bianca's unavailability by killing her?

2. Did he do so with the intention of making her unavailable as a witness?

It is not required that Rudolph's sole intention in killing his wife was making her unavailable as a witness. It only had to be one of his intentions. *United States v. Dhinsa*, 243 F.3d 635, 654 (2d Cir. 2001) ("The government need not, however, show that the defendant's sole motivation was to procure the declarant's absence; rather, it need only show that the defendant 'was motivated in part by a desire to silence the witness.'").

**I.      This court must make preliminary findings on the two questions under a preponderance standard.**

Although Rudolph's reasoning is incorrect, the government agrees with him that the two factual determinations must be made by a preponderance of the evidence standard under Rule 104(a), rather than a standard of sufficient evidence to show a preponderance under Rule 104(b). The reason is not, as Rudolph argues (ECF 231 at 4-5), that the determinations are legal questions. They are not. The reason is that 104(b) applies when the preliminary factual question that must be answered is one that goes towards relevance. Fed. R. Evid. 104(b) ("When *the relevance* of evidence depends on whether a fact exists, proof must be introduced sufficient to support a finding that the fact does exist."). But preliminary factual questions that are not directed toward relevance are governed by Rule 104(a) where the standard seems to be a simple preponderance standard. Compare *Huddleston v. United States*, 485 U.S. 681, 690 (1988) (applying 104(b) sufficiency standard where relevance depends on conditional fact under Rule 404(b)) and *United States v. Henthorn*, 864 F.3d 1241, 1254 (10th Cir. 2017) (same) with

*Bourjaily v. United States,* 483 U.S. 171, 175 (1987) (applying simple preponderance to 104(a) inquiry for purposes of 801(d)); see also *Huddleston*, 485 U.S. at 687 n.5 (discussing same).[1]

The Supreme Court has withheld answering whether a preponderance is the standard for a preliminary factual determination under Rule 804(b)(6). *Davis v. Washington*, 547 U.S. 813, 833 (2006) ("We take no position on the standards necessary to demonstrate such forfeiture, but federal courts using Federal Rule of Evidence 804(b)(6), which codifies the forfeiture doctrine, have generally held the Government to the preponderance-of-the-evidence standard."). But the United States agrees that the best reading of the 804(b)(6) commentary, Tenth Circuit precedent, and the textual differences between 104(a) and 104(b) indicate that the proper standard for preliminary factual questions under 804(b)(6) is preponderance of the evidence. *United States v. Cherry*, 217 F.3d 811, 815 (10th Cir. 2000) (applying 104(a) preponderance to 804(b)(6)); Fed. R. Evid. 804(b)(6) advisory committee's note 1997 amendments ("The usual Rule 104(a) preponderance of the evidence standard has been adopted in light of the behavior new Rule 804(b)(6) seeks to discourage."); see also *United States v. Balano*, 618 F.2d 624, 629 (10th Cir. 1979) (applying preponderance standard, but reviewing that finding for sufficient evidence).

On appeal, this court's factual findings by a preponderance of the evidence will be reviewed under deferential clear error review. *United States v. Montague*, 421 F.3d 1099, 1102 (10th Cir. 2005) ("We accept a district court's factual finding that a defendant procured the absence of a witness unless the finding is clearly erroneous.").

---

1 The government apologizes for not catching this nuance regarding the standard in its earlier filing. ECF 162 at 15. It takes some solace in the fact that the defense's failure to identify the correct reason for the differing standard shows that the correct rule is not an obvious one.

## II.     Rudolph has not renewed his challenge to many of Bianca's statements.

Before discussing the preponderance of the evidence showing that Rudolph procured his wife's absence to prevent her testimony, it is important to note that numerous statements made by Bianca to Olmstead are admissible on grounds other than Rule 804(b)(6). And Rudolph has not raised a challenge to these statements.

Rudolph has not challenged Bianca's statement to Olmstead that she found a hairclip in her bed (not offered for truth, but to explain why Bianca approached Olmstead) or her questions to Olmstead about whether Rudolph was having an affair, whether it was with Milliron, how Olmstead knew, and how she could access the emails revealing that information (questions that were not hearsay, because questions aren't assertions). See ECF 162 at 8.

Nor does his renewed motion challenge Bianca's assertions that she did not want to get divorced because of her faith and her fear of being without money. Or her contrary assertions that she would divorce Rudolph. These do not rely upon 804(b)(6), because they are admissible under 803(3) as statements of future intent. ECF 162 at 8-9. Nor does he challenge Bianca's own assertion of a past affair, which is offered for its effect on him. ECF 162 at 8.

Nor does he challenge the absence of any statements by Bianca to Olmstead about the existence of a legitimate pre-nuptial or post-nuptial agreement. The absence of such statements is not hearsay. Fed. R. Evid. 801 (statement "means a person's oral assertion, written assertion, or nonverbal conduct"). ECF 162 at 10-11.

Nor does his renewed objection encompass Bianca's statement that she was going to give him an ultimatum that he had to stop seeing Lori Milliron and fire her from the business or Bianca would seek a divorce. Or Olmstead's statements that they then rehearsed giving the ultimatum. The former satisfies Rule 803(3) as *Hillmon* statements of future intent. ECF 162 at

11. And the latter is not a statement by Bianca, but testimony by Olmstead of what they did. *Id.* Likewise, Olmstead's testimony that Bianca gave her emails between Lori and Larry is not a statement. ECF 162 at 12. And Bianca's repeat to Olmstead that she was going to confront Larry with the affair and give him an ultimatum are also admissible *Hillmon* statements. *Id.*

His renewed obligation also does not include Bianca telling Olmstead that Rudolph had followed through on breaking off the affair (not offered for the truth), Olmstead's statement that Milliron was still working for Rudolph (Olmstead is testifying and the statement is offered for effect on Bianca rather than truth), or Bianca admitting that Rudolph told her it would take some time to fire Milliron (Rudolph statement offered for effect on Bianca and her relaying to Olmstead offered for Bianca mental state, but not truth of fact asserted). ECF 162 at 13-14.

As none of the above are justified by 804(b)(6), they don't fall into the renewed motion.

### III. A preponderance of the evidence supports that Rudolph murdered his wife with the intent (among others) of making her unavailable as a witness.

It is only the following statements for which the government relies upon Rule 804(b)(6):

(1) Bianca's assertion that Rudolph often signed her name on documents,

(2) Her assertion that he was good at it,

(3) Her assertion that he had written up an agreement at their kitchen table in which she would get nothing in a divorce and had then signed her name to it,

(4) Her assertion that she tried to find the agreement for years and was worried about it,

(5) Her assertion that she later confronted Rudolph with the affair and he denied it, but then admitted it when confronted with the emails, and

(6) Her assertion that he agreed to break off the affair with Milliron and fire her.

Because a preponderance of the evidence establishes that Rudolph killed his wife in part to make her unable to offer statements about the post-nuptial agreement (statements 1 through 4)

5

in a divorce proceeding, those statements should be admitted at trial. The statements could have been offered by Bianca in a proceeding to nullify the alleged post-nuptial agreement between them. It is plain from the testimony of Rachel Anders that Rudolph was worried about the costs of a divorce long after the post-nuptial was allegedly signed. And before Olmstead's testimony, Alain Smith will testify that Rudolph was also asking concerned questions about post-nuptial agreements long after the post-nuptial was allegedly signed. Expert Jim Padish will offer further testimony before Olmstead that Rudolph had reason to be worried about whether an Arizona court would find the agreement authentic.

A preponderance of the evidence establishes that Rudolph caused Bianca's death in part to prevent her from offering testimony that the post-nuptial agreement was fraudulent at any future divorce proceedings between them. Rudolph was between a rock and a hard place. Lori Milliron had given him an ultimatum to get rid of Bianca. (Although Milliron's ultimatum is excluded by the hearsay rules from being used against Rudolph at trial, those same Rules do not apply to the court's Rule 104(a) determination. Fed. R. Evid. 104(a) ("In so deciding, the court is not bound by evidence rules, except those on privilege.")). And Bianca had given him an ultimatum to get rid of Lori. By killing Bianca, he extricated himself from Bianca testifying at a divorce proceeding once his house of cards collapsed. ECF 162 at 9-10, see also *id.* at 6-7.

Similarly, a preponderance of the evidence establishes that he killed her in part to keep statements 5 and 6 out of a divorce proceeding and his litigation against SCI. The SCI lawsuit was all about his affairs. At the time that statements 5 and 6 were made, Rudolph had filed a complaint claiming that allegations of adultery were damaging to his marriage, had lied about the nature of his relationship with Milliron in a deposition for the case, and had filed answers to interrogatories that both falsely asserted he "did not communicate with Lori Milliron via email

account or other web-based communications" between 2006 and 2013 and that carefully omitted the email account he used to send salacious emails to Milliron in response to a direct question asking him to list his accounts. Those very emails were what Bianca had gained access to, and Rudolph knew that.

He is correct that at the time his wife was killed, she had already testified favorably for him in a July 2016 deposition. ECF 231 at 6. But that is the whole point. She had testified favorably for him on the false belief that he was leaving Milliron and firing her. Once she found out the truth, she could blow up his whole SCI lawsuit by coming forward to expose the truth in what was still an ongoing lawsuit. See ECF 162 at 13, n.1. He couldn't have that.

## CONCLUSION

Once Smith and Padish have testified, this court should find by a preponderance of the evidence that Rudolph caused his wife's unavailability with an intent (among other intents) to make her unavailable to testify with regard to the 804(b)(6) statements discussed above. (Although *Montague*, 421 F.3d at 1102, discussed holding an evidentiary hearing, the evidence offered at trial is clearly a sufficient substitute. The court can judicially notice the documents from Rudolph's SCI lawsuit that it has already been agreed will come in during Rudolph's examination on the stand.)

His renewed objection should be overruled and denied.

>Respectfully submitted,
>
>COLE FINEGAN
>United States Attorney

| By: /s Bryan Fields | By: /s E. Garreth Winstead | By: /s J. Bishop Grewell |
|---|---|---|
| Bryan Fields | E. Garreth Winstead | J. Bishop Grewell |
| Assistant United States Attorney | Assistant United States Attorney | Assistant United States Attorney |
| U.S. Attorney's Office | U.S. Attorney's Office | U.S. Attorney's Office |
| 1801 California St. Suite 1600 | 1801 California St. Suite 1600 | 1801 California St. Suite 1600 |
| Denver, CO 80202 | Denver, CO 80202 | Denver, CO 80202 |
| (303) 454-0100 | (303) 454-0100 | (303) 454-0100 |
| Bryan.Fields3@usdoj.gov | Garreth.Winstead@usdoj.gov | Bishop.Grewell@usdoj.gov |
| Attorney for the Government | Attorney for the Government | Attorney for the Government |

## CERTIFICATE OF SERVICE

       I hereby certify that on the 24th day of July, 2022, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to any and all counsel of record.

*s/ Bryan Fields*
United States Attorney's Office
